# EXHIBIT F

## THIRD AMENDMENT TO LOAN DOCUMENTS

This Third Amendment to Loan Documents (the "Amendment") is entered into as of March 29, 2012 (the "Execution Date") by ▬▬▬▬▬▬▬▬▬▬▬ limited liability company ("Borrower"), and ▬▬▬▬▬▬▬▬▬▬▬ ("Lender"), to be effective as of March 1, 2012 (the "Effective Date"):

1. **Recitals.**

    1.1  As of December 4, 2007, Borrower and Lender entered into a Loan Agreement relating to the development and construction of an aloft Hotel in ▬▬▬▬▬ (as subsequently amended, the "Loan Agreement"). As of January 8, 2010, Borrower and Lender entered into an Amendment to Loan Documents amending the Loan Agreement and certain other Loan Documents. As of December 1, 2011, Borrower and Lender entered into a Second Amendment to Loan Documents for the same purpose. Capitalized terms used herein and not otherwise defined will have the meanings given such terms in the Loan Agreement.

    1.2  Capitalized terms used herein and not otherwise defined will have the meanings given such terms in the Loan Agreement.

    1.3  Borrower and Lender now desire to amend the Loan Agreement and certain other Loan Documents as set forth below.

2. **Amendments.** The Loan Documents are hereby amended as follows:

    2.1.1  Section 1 of the Note is hereby amended in its entirety and replaced with the following:

    1. **Rate of Interest.**

        1.1  Amounts outstanding under this Note will bear interest at a rate or rates per annum as may be selected by the Borrower from the interest rate options set forth below (each, an "Option"):

        (i) **Base Rate Option.** A rate per annum which is at all times equal to (A) the Base Rate plus (B) fifty (50) basis points.

        (ii) **LIBOR Option.** A rate per annum which is at all times equal to (A) Daily Libor Rate plus (B) Three Hundred Fifty (350) basis points (3.50%).

CONFIDENTIAL

If the Bank determines (which determination shall be final and conclusive) that, by reason of circumstances affecting the eurodollar market generally, deposits in dollars (in the applicable amounts) are not being offered to banks in the eurodollar market for the selected term, or adequate means do not exist for ascertaining the Daily LIBOR Rate, then the Bank shall give notice thereof to the Borrower. Thereafter, until the Bank notifies the Borrower that the circumstances giving rise to such suspension no longer exist, the interest rate for all amounts outstanding under this Note shall be equal to the Base Rate Option.

In addition, if, after the date of this Note, the Bank shall determine (which determination shall be final and conclusive) that any enactment, promulgation or adoption of or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by a governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank with any guideline, request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for the Bank to make or maintain or fund loans based on the Daily LIBOR Rate, the Bank shall notify the Borrower. Upon receipt of such notice, until the Bank notifies the Borrower that the circumstances giving rise to such determination no longer apply, the interest rate on all amounts outstanding under this Note shall be equal to the Base Rate Option.

The foregoing notwithstanding, it is understood that the Borrower may select either of the Options to apply to the outstanding amounts under this Note and may convert from one Option to a different Option in accordance with Section 3 below provided that all outstanding amounts under this Note will bear interest at only one Option at any given time and provided that Borrower will only be permitted to convert from one Option to a different Option a maximum of four (4) times in any twelve (12) month period. Interest hereunder will be calculated based on a year of 360 day for the actual number of days in the applicable periods. In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

For purposes hereof, the following terms shall have the following meanings:

"Base Rate" shall mean the higher of (A) the Prime Rate, or (B) the sum of the Federal Funds Open Rate plus fifty (50) basis points (0.50%). If and when the Base Rate (or any component thereof) changes, the rate of interest with respect to any amounts hereunder to which the Base Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

CONFIDENTIAL

COR008591

"Business Day" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Cincinnati, Ohio.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Bank by dividing (A) the Published Rate by (B) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any eurocurrency fundings by banks on such day. The rate of interest will be adjusted automatically as of each Business Day based on changes in the Daily LIBOR Rate without notice to the Borrower.

"Federal Funds Open Rate" shall mean, for any day, the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Bank (an "Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Bank at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day. The rate of interest charged shall be adjusted as of each Business Day based on changes in the Federal Funds Open Rate without notice to the Borrower.

"Prime Rate" shall mean the rate publicly announced by the Bank from time to time as its prime rate. The Prime Rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers. The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the eurodollar rate for a one month period as published in another publication selected by the Bank).

    1.2    The Base Rate Option shall be reduced to (A) the Base Rate plus (B) zero (0) basis points and the LIBOR Option shall be

CONFIDENTIAL

COR008592

reduced to (A) the Daily Libor Rate plus (B) Three Hundred (300) basis points (3.00%), after Lender's receipt of a written request for such reduction from Borrower, which request shall include evidence reasonably satisfactory to Lender that the Borrower's DSC Ratio is equal to or greater than 1.25 to 1.00 as of the date of such request; provided however, that, if after the effective date of any reduction, the Borrower's DSC Ratio is less than 1.25 to 1.00, the applicable interest rates shall thereafter be automatically increased to those set forth in Section 1.1 and shall not be reduced again until the Borrower's DSC Ratio is again equal to or greater than 1.25 to 1.00 as of the date of Borrower's subsequent request. No downward adjustment shall be made during the occurrence and continuance of an Event of Default.

2.2  The definitions set forth in Sections 2.2, 2.6, 2.8, 2.9, 2.10, 2.11, 2.15, 2.16, 2.18, 2.19 and 2.20 of the Note, and all references to such defined terms, are hereby deleted.

2.3  Section 2.5 of the Note is hereby amended to read as follows:

"2.5  "DSC Denominator" means an amount equal to the sum of the total principal and interest payments that would be required over the 12 months following the date of testing, assuming that the then outstanding principal amount of the Loan were fully-amortized based on a mortgage-style amortization over a 30 year period, applying the greater of: (i) interest at a per annum rate equal to the Ten Year Treasury Rate on the date of testing plus 2.00% per annum, or (ii) interest at the actual then effective interest rate on the Loan as of the date of the test."

2.4  Section 3.1 of the Note is hereby deleted.

2.5  Section 3.2 of the Note is amended in its entirety to read as follows:

"Borrower may on any Business Day upon delivering to Lender a Notice of Pricing Election not later than 11:00 a.m. Cincinnati time) three Business Days prior to the proposed Conversion convert the interest rate Option currently in effect under this Note from the Base Rate Option to the LIBOR Option. No Conversion will be effective unless a proper, timely and fully completed Notice of Pricing Election specifying a Conversion is delivered to Lender. No Conversions will be permitted if a Default or Event of Default has occurred. Each Notice of Pricing Election will be irrevocable by Borrower."

2.6  The form of Notice of Pricing Election attached as Exhibit A to the Note is replaced with Exhibit A attached to this Amendment.

2.7  Sections 3.3, 3.4 and 3.5 of the Note are hereby deleted.

2.8  Section 4.1 of the Note is amended in its entirety to read as follows:

CONFIDENTIAL

COR008593

"Interest will be due and payable monthly in arrears commencing on April 1, 2012, and continuing on the first day of each month thereafter until <u>April 1, 2015</u> (as it may be extended in accordance with the terms hereof, the "Maturity Date"), on which date all principal and accrued interest will be due and payable. In addition, commencing April 1, 2012 and on the first day of each and every month thereafter Borrower will make monthly principal payments according to the following schedule:

| PERIOD | ANNUAL PRINCIPAL REDUCTION | MONTHLY PRINCIPAL REDUCTION |
|---|---|---|
| April 1, 2012 – March 1, 2014 | $1,650,000.00 | $137,500.00 |
| April 1, 2014 – April 1, 2015 | $257,052.00 | $21,421.00 |

2.9   Section 7 of the Note is amended in its entirety to read as follows:

"7.   <u>Prepayment</u>. Borrower may prepay, at any time and from time to time, in whole or in party, without penalty, all or any portion of the Total Facility. Payments received will be applied in the following order: (i) to repayment of any amounts owed to Lender for charges, fees and expenses (including reasonable Attorneys' Fees), (ii) to accrued interest, and (iii) to installments of principal payable hereunder in the inverse order of maturity."

2.10   Section 1.26 of the Loan Agreement is amended in its entirety to read as follows:

"<u>Guarantor</u>. CRIC and Corporex Companies, jointly and severally, and any other Person in the future guaranteeing all or any part of the Obligations or the completion of the Project."

2.11   Section 1.55 of the Loan Agreement is amended in its entirety to read as follows:

"<u>Guarantee</u>. The Guarantee of CRIC and Corporex Companies pursuant to the terms of that certain Guarantee dated as of December 4, 2007, as amended, and as joined in by Corporex Companies pursuant to the terms of the Amendment to Loan Documents dated as of February 1, 2012."

2.12   A new Section 1.56 is added to the Loan Agreement as follows:

"<u>Corporex Companies</u>. Corporex Companies, LLC, a Kentucky limited liability company, which is the Guarantor hereunder."

-5-

CONFIDENTIAL

COR008594

2.13 Section 6.8.2 of the Loan Agreement is amended in its entirety to read as follows:

6.8.2 <u>Quarterly Statements of Borrower</u>. Furnish Lender within 30 days after the end of each calendar quarter internally prepared unaudited financial statements which will: (i) include a balance sheet as of the end of such quarter, profit and loss statements and a statement of cash flows for such quarter; (ii) be in the form historically provided by Borrower; and (iii) be accompanied by a compliance certificate in Proper Form."

2.14 Section 6.8.3 of the Loan Agreement is amended in its entirety to read as follows:

6.8.3 <u>Periodic Statements of Borrower</u>. Furnish Lender within 45 days following the conclusion of the twelve-month period ended August 31, 2014, internally prepared unaudited financial statements of Borrower which will: (i) include a balance sheet as of the end of such period, profit and loss statements and a statement of cash flows for such period; (ii) be in the form historically provided by Borrower; and (iii) be accompanied by a compliance certificate in Proper Form."

2.15 The phrase "a compliance certificate in Proper Form" as used in Sections 6.8.1, 6.8.2 and 6.8.3 of the Loan Agreement, shall mean the form of Borrower Compliance Certificate (the "Borrower Compliance Certificate") attached as <u>Exhibit B</u> to this Amendment. The phrase "covenant compliance certificate" as used in Section 3.9 of the Guarantee, shall mean the form of Guarantor Compliance Certificate attached as <u>Exhibit C</u> to this Amendment.

2.16 Section 7.8.3.6 of the Loan Agreement is hereby amended to refer to Corporex Companies in addition to CRIC, and Corporex Companies shall, in addition to CRIC, remain the Guarantor in the event of a merger or transfer described in Section 7.8.3 and both entities shall execute documentation verifying their respective obligations, unless a Substitute Guarantor meeting the requirements of Section 7.8.3.6 becomes a Guarantor in lieu of CRIC and Corporex Companies, collectively. Further, upon a merger or transfer as described in Section 7.8.3 of the Loan Agreement which satisfies all of requirements in Section 7.8.3, and in which a Substitute Guarantor is replacing both CRIC and Corporex Companies as described above, both CRIC and Corporex Companies shall be released from liability accruing after the date of the transfer in accordance with Section 7.8.3.9.

2.17 Section 7.8.4.8 of the Loan Agreement is hereby amended to refer to Corporex Companies in addition to CRIC, and Corporex Companies shall, in addition to CRIC, remain the Guarantor in the event of a merger or transfer described in Section 7.8.4 and both entities shall execute documentation verifying their respective obligations, unless a Substitute Guarantor meeting the requirements of Section 7.8.3.6 becomes a Guarantor in lieu of CRIC and Corporex

CONFIDENTIAL

COR008595

Companies, collectively. Further, upon a merger or transfer as described in Section 7.8.4 of the Loan Agreement which satisfies all of requirements in Section 7.8.4, and in which a Substitute Guarantor is replacing both CRIC and Corporex Companies as described above, both CRIC and Corporex Companies shall be released from liability accruing after the date of the transfer in accordance with Section 7.8.4.11.

2.18 Section 7.16 of the Loan Agreement is amended in its entirety to read as follows:

"<u>DSC Ratio</u>. Permit the DSC Ratio (as defined in the Note) for the Borrower to be less than:

1.05 to 1.00 for the twelve (12) month period ended <u>August 31, 2014</u>.

Provided however, that Borrower may achieve the DSC Ratio required by this Section by: (a) causing the issuance of a letter of credit in Proper Form (with Lender as beneficiary) or posting cash collateral into a pledged account at Lender and in Lender's name, in either case in an amount sufficient to achieve the required DSC Ratio, assuming that the principal balance of the Loan used in calculating the DSC Denominator were reduced by the amount of such letter of credit (a "Letter of Credit") or cash collateral; or (b) by making a payment of principal of the Loan in an amount sufficient to reduce the DSC Denominator by an amount sufficient to achieve the required DSC Ratio. The Letter of Credit will have an expiration date at least sixty (60) days after the Maturity Date and the account party on the Letter of Credit will be a Person other than the Borrower. The amount of the Letter of Credit or cash collateral will be subsequently adjusted up or down, via an amendment thereto (in the case of the Letter of Credit), as necessary for the Letter of Credit or cash collateral, as applicable to cause compliance with the DSC Ratio as of the next ensuing test period(s)."

2.19 Section 8.1.12 of the Loan Agreement is amended in its entirety to read as follows:

"8.1.12 Unless in Lender's reasonable opinion the same is adequately insured or bonded, the entry of a final, unstayed judgment for the payment of money involving more than $100,000 against Borrower and the failure by it to discharge the same, or cause it to be discharged, within 30 days from the date of the order, decree or process under which or pursuant to which such judgment was entered, or to secure a stay of execution pending appeal of such judgment."

2.20 A new Section 8.1.19 is hereby added to the Loan Agreement as follows:

8.1.19 One or more judgments for the payment of money with respect to Corporex Companies is outstanding against Corporex Companies, where: (a) any one of such judgments has not been paid, discharged, vacated, adequately

CONFIDENTIAL

COR008596

insured or bonded (in Lender's reasonable opinion) or stayed pending appeal within thirty (30) days after the date such judgment was entered, and (b) the judgment results in Corporex Companies not being in compliance with the net worth or liquidity covenants set forth in Sections 3.7 and 3.8 of the Guaranty calculated based on the most recent financial statements of Corporex Companies delivered to Lender in accordance with this Agreement.

2.21 That certain Guarantee dated as of December 4, 2007 executed by Corporex Realty & Investment, LLC, a Kentucky limited liability company ("CRIC") in favor of Lender, is hereby amended to add Corporex Companies, LLC, a Kentucky limited liability company ("Corporex Companies") as a Guarantor. By execution of this Amendment, Corporex Companies joins in the Guarantee and is made a party to all obligations, representations and warranties, covenants, terms, conditions and agreements of Guarantor as set forth in the Guarantee in the same manner as if Corporex Companies had executed a separate Guarantee. The obligations of CRIC and Corporex Companies under the Guarantee will be joint and several.

2.22 Section 1.1 of the Guarantee is amended in its entirety to read as follows:

"1.1 . The liability of Guarantor hereunder shall be unlimited unless and until: (a) the Borrower's "DSC Ratio" (as defined below) is at least 1.20 to 1.00 for the twelve (12) months immediately prior to the month of the date of testing, and (b) no Default or Event of Default shall exist. Upon written request by Guarantor and receipt by Lender of evidence establishing satisfaction of both of the foregoing conditions, the maximum aggregate liability recoverable from Guarantor hereunder (the "Maximum Amount") will be limited to $9,062,500. For purposes of this Section 1.1, Borrower may achieve the DSC Ratio required by this Section by: (a) causing the issuance of a letter of credit in Proper Form (with Lender as beneficiary) in an amount sufficient to achieve the required DSC Ratio, assuming that the then outstanding principal balance of the Loan used in calculating the DSC Denominator were reduced by the amount of such letter of credit (a "Letter of Credit"); or (b) by making a payment of principal of the Loan in an amount sufficient to reduce the DSC Denominator by an amount sufficient to achieve the required DSC Ratio. The Letter of Credit will have an expiration date at least sixty (60) days after the Maturity Date and the account party on the Letter of Credit will be a Person other than the Borrower. The amount of the Letter of Credit will be subsequently adjusted up or down, via an amendment, as necessary for the Letter of Credit to cause compliance with the DSC Ratio as of the next ensuing test period(s).

For purposes of this Section 1.1, the term "DSC Ratio" means, at any particular date, the ratio of (a) Net Operating Income to (b) the DSC Denominator, as such terms are defined below in this Section 1.1 and notwithstanding any other definition of such terms elsewhere in the Loan Documents:

CONFIDENTIAL

COR008597

"Net Operating Income" (NOI) will mean, for the twelve months immediately prior to and including the date of testing, Borrower's: (i) net income, determined in accordance with GAAP applied on a consistent basis, assuming (A) an expenditure of 4.0% of Gross Revenues for a management fee, and (B) the greater of actual capital expenditures for the period under examination or a minimum of four percent (4%) of Gross Revenues for a replacement reserve; plus the following items to the extent they were deducted from Gross Revenues to determine net income: (ii) depreciation, amortization, and other items which would be classified as non cash charges; plus (iii) interest payments made on the Loan, and excluding extraordinary items including, but not limited to, gain or loss from the sale or disposition of capital assets.

"DSC Denominator" means an amount equal to the sum of the total principal and interest payments that would be required over the 12 months following the date of testing, assuming that the then outstanding principal amount of the Loan were fully-amortized based on a mortgage-style amortization over a 25-year period, applying the greater of: (i) interest at a per annum rate equal to the Ten Year Treasury Rate on the date of testing plus 2.00% per annum, or (ii) interest at a rate per annum equal to 7.00%."

2.23 Section 3.7 of the Guarantee is amended in its entirety to read as follows:

"3.7 Corporex Companies shall maintain at all times a net worth of at least $150,000,000.00, calculated on a current value basis in a manner consistent with the calculation thereof for the period ended December 31, 2010, as historically prepared by Corporex Companies, and/or its subsidiary CRIC, and presented in its consolidated financial report and statements, together with an opinion letter prepared by an independent current valuation expert reasonably acceptable to Lender. Such financial covenant shall be tested by Lender on at least a semi-annual basis as of each June 30 and December 31 based on the financial statements for such periods submitted in accordance with Section 3.9, below and at such other times and as otherwise reasonably requested by Lender based on current internally prepared unaudited and certified financial statements for the most recent month end as requested by Lender and delivered within thirty (30) days of such request."

2.24 Section 3.8 of the Guarantee is amended in its entirety to read as follows:

"3.8 Corporex Companies shall maintain at all times unrestricted and unencumbered Liquid Assets on a consolidated basis of at least $10,000,000.00. "Liquid Assets" shall mean all of Corporex Companies' cash, cash equivalents and Marketable Securities. The term "Marketable Securities" means investment grade bonds or stocks of investment grade corporations listed on the New York Stock Exchange or NASDAQ. For purposes of the preceding sentence, "investment grade" means that the issuer of the applicable security has a debt rating from Standard & Poor's of at least BBB- or better. Such financial covenant shall be tested by Lender on at least a semi-annual basis as of each

CONFIDENTIAL

COR008598

June 30 and December 31 based on the financial statements for such periods submitted in accordance with Section 3.9, below, and at such other times as reasonably requested by Lender, based on written evidence of the then current Liquid Assets of Corporex Companies as of the date of such request within fifteen (15) days of such request, which shall be verified with bank or brokerage account statements or evidence otherwise acceptable to Lender."

2.25 Section 3.9 of the Guarantee is amended in its entirety to read as follows:

"3.9 Corporex Companies, LLC ("Corporex Companies") shall furnish to Lender the following financial statements all in the form historically provided by Corporex Companies: (i) within 30 days of the end of each calendar quarter (except for the period ended December 31), internally prepared unaudited and certified financial statements, including a balance sheet, profit and loss and surplus statements; (ii) by January 31 and July 31 each year, a covenant compliance certificate for the periods ended December 31 and June 30, respectively; and (iii) within 120 days after the end of each calendar year, audited financial statements prepared by the Corporex Companies' accountant. In addition, Borrower will deliver to Lender when it delivers Borrower's annual financial statement to Lender a Compliance Certificate. The annual audited financial statements required by item (iii) of the preceding sentence will be consolidated and consolidating audited balance sheets of Corporex Companies and its Subsidiaries as at the end of such fiscal year and be accompanied by consolidated and consolidating related audited statements of income, expense and retained earnings, cash flow statements, and statements of changes in members' equity of Corporex Companies and its Subsidiaries for such year, setting forth in each case in comparative form figures for the previous fiscal year, all in reasonable detail, fairly presenting the financial position of Corporex Companies and its Subsidiaries and the results of operations of Corporex Companies and its Subsidiaries for the fiscal year then ended, and prepared in accordance with Generally Accepted Accounting Principles consistently applied. Such statements shall be examined in accordance with generally accepted auditing standards and accompanied by an unqualified opinion of independent certified public accountants (which accountants shall be selected by the Guarantor but must be satisfactory to the Lender)."

2.26 That certain Environmental Indemnity Agreement dated as of December 14, 2007 executed by Borrower and CRIC in favor of Lender, is amended to add Corporex Companies as an Indemnitor. By execution of this Amendment, Corporex Companies joins in and is made a party to, jointly and severally with the other Indemnitors, all obligations, representations and warranties, covenants, terms, conditions and agreements of Indemnitor as set forth in the Environmental Indemnity Agreement in the same manner as if Corporex Companies had executed a separate Environmental Indemnity Agreement.

CONFIDENTIAL

COR008599

3. **Waivers; Acknowledgement re Ownership Transfers.**

   3.1 Lender hereby acknowledges and agrees that the transfer of all of CRIC's ownership interest in ~~[redacted]~~ liability company which is the Manager and sole Member of Borrower ("CSSH"), to Corporex Companies which occurred prior to the Execution Date does not violate the existing terms and conditions of the Loan Documents, and that notwithstanding such transfer, neither Borrower nor any Guarantor is in default of any terms and conditions of the Loan Documents, including, but not limited to, Section 7.8 of the Loan Agreement and Section 4.11 of the Deed of Trust, prior to or as of the Execution Date.

   3.2 Guarantor Covenants. Each and every section, term or provision of the Guarantee requiring CRIC to maintain a minimum level of Liquid Assets (as that term was defined and used in the Guarantee prior to the execution of this Amendment) and a minimum net worth which provide(s) that failure to maintain such minimum level of Liquid Assets or minimum net worth (collectively, the "CRIC Financial Covenants") is or may have at any time been an Event of Default under the Loan Documents, is hereby deleted in its entirety, with respect to and as such terms and provisions relate to CRIC. Further, Lender hereby expressly waives any right it may now have or may have had to declare an Event of Default for (a) an alleged failure of CRIC to be in compliance with the CRIC Financial Covenants; (b) for any alleged past failure, but only through the date of this Amendment, of CRIC to perform or be in compliance with any other obligations, representations, warranties or agreements under its Guarantee or the other Loan Documents including but not limited to the Member Interest Transfer; or (c) any right that Lender may have or have had to exercise any rights of set off against Borrower, CRIC or any other Guarantor arising out of any alleged failure of CRIC to be in compliance with such CRIC Financial Covenants, except if an Event of Default under (a), (b) or (c) above would have occurred but for Borrower's fraud, misrepresentation or intentional misconduct. Notwithstanding the foregoing, the Lenders acknowledge and agree that Borrower has disclosed the transfer of certain assets from CRIC prior to the date of this Third Amendment and that such asset transfers shall not be deemed an Event of Default under any of the Guaranty or any other Loan Documents.

   3.3 Insolvency Default. Each and every section, term and provision of the Loan Agreement, Guarantee, and any of the other Loan Documents, pertaining to the filing of voluntary or involuntary bankruptcy and/or insolvency proceedings with respect to CRIC, including, but not limited to, the right of Lender to declare an Event of Default under Sections 8.1.5 of the Loan Agreement, in the event that CRIC files a voluntary or has filed against it an involuntary petition in bankruptcy or is adjudicated bankrupt or insolvent, or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future applicable federal

CONFIDENTIAL

COR008600

bankruptcy act or any other present or future applicable federal, state or other statute or law, makes an assignment for the benefit of creditors, or seeks or acquiesces in the appointment of any trustee, receiver or liquidator of CRIC of all or any part of its properties, are each hereby deleted in their entirety solely as they pertain and relate to CRIC, it being the intent, understanding and agreement of Borrower, Lender, CRIC, and each Guarantor, that the bankruptcy, voluntary or involuntary, or any other insolvency or receiver proceedings with respect to CRIC shall not trigger an Event of Default under the Loan Agreement, the Guarantee, or any other Loan Documents.

4. **Conditions Precedent.** The effectiveness of this Amendment is subject to the satisfaction of the following conditions precedent:

   4.1 **Authority Documents.** Lender will have been furnished copies, certified by Borrower and all applicable constituent entities of Borrower, of resolutions of the Borrower and Guarantor, respectively, authorizing the execution of this Amendment and all of the related documentation, as applicable.

   4.2 **Amendment Documentation.** Lender shall have received this executed Amendment and each of the other items listed on the Closing Memorandum dated as of the date hereof, all in Proper Form.

   4.3 **Fees.** Borrower will have paid to Lender a fee in the amount of $79,834.30 plus all attorneys' fees and out-of-pocket expenses of Lender incurred in connection with this Amendment and related documentation.

   4.4 **Representations.** The representations and warranties of Borrowers herein will be true.

5. **Representations, Warranties and Covenants.** To induce Lender to enter into this Amendment, Borrower represents, warrants and covenants as follows:

   5.1 **Further Assurances.** Borrowers agree to execute such other instruments and documents and provide Lender with such further assurances as Lender may reasonably request to more fully carry out the intent of this Amendment.

   5.2 **Representations and Warranties.**

      5.2.1 The representations and warranties of Borrower contained in Article 5 of the Loan Agreement are deemed to have been made again on and as of the date of execution of this Amendment and will apply to this Amendment.

      5.2.2 No Default, Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists on the date hereof.

CONFIDENTIAL

COR008601

    5.2.3  The persons executing this Amendment on behalf of Borrower and Guarantor, respectively, is a duly elected and acting officer of such entity and is duly authorized to execute and deliver this Amendment on behalf of such entity.

5.3  **Release.** Guarantor and Borrower each represent and warrant that they have no claims, counterclaims, setoffs, actions or causes of actions, damages or liabilities of any kind or nature whatsoever whether at law or in equity, in contract or in tort, whether now accrued or hereafter maturing (collectively, "Claims") against Lender or any Lender's Affiliate, or any of the foregoing's respective directors, officers, employees, agents, attorneys and legal representatives, or the successors or assigns of any of them (collectively, "Lender Parties") that directly or indirectly arise out of, are based upon or are in any manner connected with any Prior Related Event. As an inducement to Lender to enter into this Amendment, Guarantor and Borrower on behalf of themselves, and their respective successors and assigns hereby knowingly and voluntarily release and discharge all Lender Parties from any and all Claims, whether known or unknown, that directly or indirectly arise out of, are based upon or are in any manner connected with any Prior Related Event. As used herein, the term "Prior Related Event" means any transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted or begun at any time prior to the Execution Date or occurred, existed, was taken, was permitted or begun in accordance with, pursuant to or by virtue of any of the Loan Documents or any documents executed in connection with the Loan Documents or which was related to or connected in any manner, directly or indirectly, to the extension of credit represented by the Loan Documents. The Borrower and Guarantor further agree to indemnify, defend and hold the Lender Parties harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against any of the Lender Parties on account of any claims arising out of or relating to the Obligations; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to a Lender Party's gross negligence or willful misconduct. Each of the Guarantor and Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6.  **Ratification.** Borrower hereby ratifies and reaffirms its obligations under the Loan Documents. Borrower hereby reaffirms and grants to Lender a security interest in and lien upon all of the Collateral. Borrower acknowledges that the principal balance outstanding under the Note as of the Effective Date is $17,740,956.64 and that such balance is fully secured by the Collateral.

7.  **Consent and Agreement of CRIC.** Guarantor consents to the provisions of this Amendment and confirms and agrees that: (a) the Guarantor's obligations under its Guarantee, except as expressly modified by this Amendment, shall be unimpaired by

CONFIDENTIAL

COR008602

this Amendment; and (b) all of the terms, conditions and covenants in the Guarantee, except as expressly modified by this Amendment, remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guarantee are true and correct. Guarantor further agrees that the consent set forth herein will not be deemed to require the consent of the Guarantor to further modifications, amendments or other actions with respect to the Loan, or any party or collateral liable therefor, which the Lender is permitted to take or omit to take pursuant to the terms of the Guarantee. Guarantor joins in the execution of this Amendment to confirm the foregoing statements in this Section, to join in the representations, warranties, release and indemnity set forth in Section 5.3 above, and to waive the right to trial by jury as set forth in Section 9.10 below.

8. **Consent and Agreement of Corporex Companies.** Corporex Companies, as a Guarantor, consents to the provisions of this Amendment and all of the Loan Documents, as previously amended, and confirms and agrees that all of the terms, conditions and covenants in the Guarantee remain unaltered and in full force and effect and apply to the Obligations, as modified by the Amendment, the Loan Documents and all previous amendments to the same. The Guarantor certifies that all representations and warranties made in the Guarantee are true and correct as to Corporex Companies. Guarantor further agrees that the consent set forth herein will not be deemed to require the consent of the Guarantor to further modifications, amendments or other actions with respect to the Loan, or any party or collateral liable therefor, which the Lender is permitted to take or omit to take pursuant to the terms of the Guarantee. Guarantor joins in the execution of this Amendment to confirm the foregoing statements in this Section, to join in the representations and warranties set forth in Section 5.2 above, and to waive the right to trial by jury as set forth in Section 9.10 below.

9. **General.**

    9.1  Except as expressly modified herein, the Loan Documents, as amended, are and remain in full force and effect.

    9.2  Except as expressly set forth in this Amendment, nothing contained herein will be construed as waiving any Default or Event of Default under the Loan Documents or will affect or impair any right, power or remedy of Lender under or with respect to the Obligations, the Loan Agreement, as amended, the Note, as amended, the Loan Documents, as amended, or any other agreement or instrument guaranteeing, securing or otherwise relating to any of the Obligations.

    9.3  This Amendment will be binding upon and inure to the benefit of Borrower and Lender and their successors and assigns.

    9.4  All representations, warranties, agreements, releases, and covenants made by Borrower and Guarantor herein will survive the execution and delivery of this Amendment.

CONFIDENTIAL

COR008603

9.5 This Amendment will in all respects be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts of law principles.

9.6 The execution and delivery of this Amendment shall not constitute a novation of the Note. A copy of this Amendment may be attached to the Note as an allonge.

9.7 This Amendment may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission or electronic mail shall be deemed to be an original signature hereto.

9.8 This Amendment and the documents and instruments to be executed hereunder constitute the entire agreement among the parties with respect to the subject matter hereof and shall not be amended, modified or terminated except by a writing signed by the party to be charged therewith.

9.9 The Loan Documents are hereby modified to include this Amendment within the definition of the term "Loan Documents" as used therein.

9.10 BORROWER, GUARANTOR AND LENDER EACH IRREVOCABLY WAIVE ANY RIGHT IT MIGHT HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AMENDMENT, ANY OF THE LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. BORROWER, GUARANTOR AND LENDER ACKNOWLEDGE AND AGREE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY. BORROWER AND GUARANTOR ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AMENDMENT, INCLUDING THE WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

COR008604

**SIGNATURE PAGE TO THIRD AMENDMENT TO LOAN DOCUMENTS**

By: ███████████████████, a Kentucky limited liability company, Its Managing Member

By: _____
Thomas E. Banta
President

Guarantor acknowledges and consents to the foregoing Amendment, and joins in the execution of this Amendment for the purpose of (a) joining in the representations, warranties, release and indemnity set forth in Section 5.3 above, (b) making the statements set forth in Section 7 of the Amendment, and (c) waiving the right to trial by jury as set forth in Section 9.10 above.

**CORPOREX REALTY & INVESTMENT, LLC**, a Kentucky limited liability company

By: _____
Thomas E. Banta
President

CONFIDENTIAL

COR008605

## SIGNATURE PAGE TO THIRD AMENDMENT TO LOAN DOCUMENTS

Guarantor acknowledges and consents to the foregoing Amendment, and joins in the execution of this Amendment for the purpose of (a) acknowledging and agreeing that it is now a Guarantor of the Loan and has become a party to the Guarantee and the Environmental Indemnity Agreement in accordance with Sections 2.21 and 2.26 above, (b) joining in the representations and warranties set forth in Section 5.2 above, (b) making the statements set forth in Section 8 of the Amendment, and (c) waiving the right to trial by jury as set forth in Section 9.10 above. The obligations of the undersigned under the Guarantee will be joint and several with CRIC.

CORPOREX COMPANIES, LLC, a Kentucky limited liability company

By: _____
Thomas E. Banta
President

-17-

CONFIDENTIAL

COR008606

## SIGNATURE PAGE TO THIRD AMENDMENT TO LOAN DOCUMENTS



By: ███
Print Name: ███
Title: Executive V.P.

592526_2.DOC

- 18 -

CONFIDENTIAL

COR008607